UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

KENYA R. MANSTRA,               )
                                )
          Plaintiff,            )
                                )
v.                              )      No.:   3:10-CV-166
                                )             (VARLAN/SHIRLEY)
NORFOLK SOUTHERN CORPORATION,   )
                                )
          Defendant.            )

## MEMORANDUM OPINION

This civil action is before the Court on the Motion for Summary Judgment [Doc. 43],

submitted by defendant Norfolk Southern Corporation ("NSC"), in which NSC moves the

Court, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment on

all claims of plaintiff Kenya R. Manstra.  In her complaint, plaintiff claims sex-based

discrimination and retaliation in violation of Title VII, 42 U.S.C. §§ 2000e, *et seq.* ("Title

VII"), and the Tennessee Human Rights Act, Tenn. Code Ann. §§ 4-21-101, *et seq.* (the

"THRA"), and retaliatory discharge in violation of the THRA, the Tennessee Public Protective

Act, Tenn. Code Ann. § 50-1-304 (the "TPPA"), and the Tennessee common law.  Plaintiff has

responded in opposition [Doc. 51] to NSC's motion for summary judgment, and NSC has filed

a reply [Doc. 53] to that response.[1]  The matter is ripe for determination.

---

[1]Plaintiff also filed a supplement to her response to NSC's motion for summary judgment
[Doc. 69], to which NSC filed a consolidated response and notice of supplemental authority [Doc.
70].  The Court notes first that plaintiff's supplement is not in accordance with Local Rule 7.1(d)
because plaintiff did not obtain prior approval from the Court before filing her supplement and
because the supplement discusses no developments that have occurred since plaintiff filed her
response.  *See* E.D. TN. LR 7.1(d).  However, notwithstanding this non-compliance, the Court has
reviewed and considered the supplemental briefs of both plaintiff and NSC and the arguments and
law given therein.

Upon careful review of the parties' briefs, the exhibits, the related filings, and the applicable law, and for the reasons set forth herein, NSC's motion for summary judgment will be **GRANTED** and plaintiff's claims will be **DISMISSED**. This case will be **CLOSED**.

## I.    Facts

Plaintiff was hired in July 2007 as a trainee in NSC's management training program, a 15-month program which provides trainees with on-the-job training in different locations with different managers and supervisors who review and critique the trainees' performance. For most of plaintiff's training, she was assigned to the Knoxville terminal. Throughout her training, plaintiff worked with trainmaster Jimmy McKeehan ("McKeehan"), trainmaster Chris Morris ("Morris"), transportation training manager Dominick Browne ("Browne"), terminal superintendent Skip Stigall ("Stigall"), and training coordinator Steve Guinn ("Guinn"). These individuals provided performance feedback to plaintiff through emails and counseling sessions, both over the telephone and in person, and communicated with NSC management regarding plaintiff's job performance.

In November 2007, during the first few months of her training, NSC management held a performance meeting, attended by plaintiff and several members of management. During that meeting, management expressed several concerns regarding plaintiff's job performance. Following the performance meeting, NSC placed plaintiff on a development action plan (the "DAP") [Doc. 43-2, pp. 6-9; Doc. 43-9, pp. 1-4]. The DAP outlines NSC's concerns about plaintiff's job performance, including a lack of initiative and assertiveness in learning her job

2

duties and responsibilities, not engaging in learning the operations of the terminal, frequent requests to not work her assigned shifts, a lack of interest in job responsibilities, and sending personal text messages and having personal telephone conversations during work hours [Doc. 43-9, pp. 3-4]. The DAP also contains several requirements plaintiff was instructed to follow in the next phase of her training and warned plaintiff that "future occurrences of concerns with your performance may result in further action to include dismissal." [*Id.*; Doc. 43-2, pp. 6-9].

In June 2008, Stigall completed an evaluation of plaintiff's job performance during her training in January and February 2008 [Doc. 43-2, pp. 37-40]. The evaluation rated plaintiff's performance unsatisfactory in nine of eleven categories and found that her overall performance needed improvement to meet NSC's expectations [*Id.*].

Plaintiff was promoted to the position of trainmaster on October 1, 2008 and assigned the position of trainmaster at the Knoxville terminal. On November 15, 2008, a "side-swipe incident" occurred while plaintiff was on duty at the Knoxville terminal [Doc. 43-7]. After the incident, Morris, plaintiff's supervisor, wrote a summary stating that it was his opinion that plaintiff had handled the incident improperly because she had not reported it, sent an unqualified employee to investigate it, and improperly described it [*Id.*, pp. 6-7]. Both Morris and Stigall discussed the incident with plaintiff and the issues they had with her performance in regard to the incident [Doc. 43-2, p. 59].

On December 22, 2008, NSC placed plaintiff on a performance improvement plan (the "PIP") [Doc. 43-2, pp. 24, 61-62]. The PIP noted targeted performance areas in which

plaintiff needed improvement and outlined steps for plaintiff to complete within thirty days of the PIP [*Id.*]. Following plaintiff's placement on the PIP, Guinn met with plaintiff on January 7 and 9, 2009, to discuss her job performance [Doc. 43-8, pp. 3-5]. During their discussions, Guinn noted several areas in which plaintiff's performance was deficient. Guinn also noted that plaintiff failed to make passing scores on two tests she took on January 8, 2009: a Train & Engine Rules Examination test and a Train & Engine Power Brake Examination test (the "rules examinations") [*Id.*].

On January 17, 2009, Mark Manion ("Manion"), NSC's executive vice president of operations, terminated plaintiff's employment as a result of her progressive performance issues and failure to meet the requirements of the PIP [Doc. 43-4].

Plaintiff's claims of sex-based discrimination and retaliation arise from and relate to events that occurred during her training period and after her promotion. During her employment with NSC, it is undisputed that plaintiff was placed on two performance plans: the DAP, when she was a trainee, and the PIP, following her promotion. The DAP and the PIP both outlined specific steps for plaintiff to improve her job performance. It is also undisputed that plaintiff lodged several verbal and written complaints with NSC and with her supervisors regarding what she considered to be harsh, improper, and unfair treatment by her supervisors and her co-workers. Plaintiff also lodged a complaint with NSC's equal employment office (the "EEO"), and confirmed the contents of an anonymous email which discussed an alleged sexual assault incident in March 2008 that occurred while plaintiff was off-duty and instances where NSC employees allegedly referred to plaintiff in a sexual way.

4

Finally, it is undisputed that during her training and following her promotion, NSC management and plaintiff's supervisors notified plaintiff through email, formal counseling sessions, and through the DAP and the PIP, that she was not satisfactorily performing a number of her job duties. Relevant events from plaintiff's training and after her promotion include the following:

Within the first few months of plaintiff's training, McKeehan, who supervised plaintiff during the first part of her training, reported by email to Stigall that plaintiff only did the bare minimum of work required of her and lacked interest in her training, including learning how to document delays in train scheduling and terminal operations [Doc. 43-2, p. 31]. McKeehan also observed that during work hours, plaintiff performed non-work related activity on her computer, sent personal text messages, and had personal conversations on the phone with her fiancee during work hours [*Id.*; Doc. 43-2, pp. 6-8]. In her deposition, plaintiff admits to the conduct noted by McKeehan. However, plaintiff asserts that she was never aware of McKeehan's criticism and was never given a chance to respond to his email.

On January 22, 2008, Morris, a trainmaster who supervised plaintiff during the second part of plaintiff's training, counseled plaintiff, both verbally and in writing, about her failure to send him certain information [Doc. 43-2, pp. 10-12, 33]. Morris also counseled plaintiff about her behavior during a one-on-one training session plaintiff observed as part of her training and about plaintiff's failure to file required weekly trainee reports [*Id.*].

On January 30, 2008, during a status report phone call between plaintiff and Stigall [Doc. 43-2, pp. 43-58], NSC asserts that plaintiff was unable to answer questions relating to

5

basic aspects of her job and that plaintiff admitted to Stigall she did not know what was going on in the terminal [*Id.*]. Plaintiff complained to Morris that Stigall acted in a harsh and condescending manner towards her during this status report phone call [*Id.*, p. 22].

On June 30, 2008, plaintiff filed a complaint with NSC's EEO office regarding her unhappiness at being assigned to the Knoxville terminal rather than Norfolk terminal. Plaintiff complained that she had been told she would be transferred to Norfolk, and, relying on that information, she had placed a non-refundable deposit on a house in Norfolk. Plaintiff also expressed concerns about Stigall's harsh and condescending manner towards her during their January 30, 2008 conversation and what she perceived to be Stigall's untimeliness in providing her job performance feedback [Doc. 43-2, pp. 20-23; Doc. 51-1, pp. 104-06].

On July 15, 2008, plaintiff sent Browne an email stating that she felt she was not receiving equal opportunities as compared to other trainees [Doc. 51-1, p. 88]. NSC asserts that in August 2008, Stigall, Guinn, and Morris held a meeting with plaintiff during which it was explained to plaintiff that she needed to work harder and she was given steps to take in order to better learn terminal operations [Doc. 43-5, p. 3]. On September 4, 2008, Guinn sent plaintiff and other employees an email alerting them of an instance in which they had failed to file safety audits [Doc. 53-8, pp. 3-4].

On September 30, 2008, plaintiff complained to NSC about an incident regarding J. Blake Chambers ("Chambers"), a male co-worker, alleging that Chambers acted in a hostile and abusive manner towards her during their shift [Doc. 51-1, p. 111]. Plaintiff complained that "Chambers was very disrespectful, with his tone and language, argumentative, and

6

uncooperative . . . I do not feel that I deserve to be harassed, disrespected, and treated in such a manner." [*Id.*].

On three occasions following plaintiff's promotion on October 1, 2008, Morris notified her by email that she had failed to submit required reports [Doc. 43-7, pp. 3-5].

On October 13, 2008, NSC received an anonymous email which refers to plaintiff in the third person [Doc. 51-1, pp. 89-90]. The anonymous email references issues plaintiff had previously raised in her June 30, 2008 EEO complaint regarding her assignment to the Knoxville terminal [*Id.*]. The anonymous email also states that a trainmaster was mistreating plaintiff, that none of the other trainmasters wanted to work with plaintiff because they thought she would tell on them, that plaintiff did not want to work with one trainmaster because "she does not trust in him in a sexual way stemming from something that happened off duty[,]" that plaintiff had heard the only reason she was in Knoxville was to force her to quit for filing the EEO complaint, and that several of the trainmasters "talk unfavorably about her in a sexual way . . . [and] it shows in the way they treat her at work." [*Id.*].

NSC contacted plaintiff after receiving the anonymous email. Plaintiff told NSC that she did not know who authored the email but that she could confirm the "truth" of its contents [Doc. 43-6, p. 5]. Plaintiff also elaborated on the sexual incident referred to in the email, stating that it was an attempted sexual assault on her by Brandon Smith ("Smith"), a male trainee, that occurred in March of 2008 while plaintiff was off-duty [Doc. 43-2, pp. 13-17]. Plaintiff did not report this incident at the time it occurred [*Id.*, p. 17], and it appears to be undisputed that it was only brought to NSC's attention in the anonymous email. After

7

receiving the anonymous email and plaintiff's confirmation of its contents, NSC created an internal report and launched an internal investigation [Doc. 43-6, ¶ 4]. The internal report details NSC's investigation and notes that it was unable to corroborate the March 2008 incident involving Smith [*Id.*, pp. 3-5; Doc. 43-2, pp. 13-18].

Throughout her employment, plaintiff alleges that Stigall acted towards her in a harsh and condescending manner. She alleges that both Stigall and Morris refused to give her employment guidance, but that they gave guidance to male trainees. Plaintiff asserts that her co-workers, Kevin Triplett ("Triplett") and William Hitch ("Hitch"), agree that plaintiff's supervisors picked on her, that plaintiff was given less training, and that she was treated more harshly than male trainees [Doc. 51-1, pp. 92-96]. Plaintiff alleges that she asked her supervisors if she could go on "saturation checks" and on derailment investigations, but unlike male trainees, she was never invited or allowed to do so. Finally, she alleges that NSC did not perform a thorough investigation into her EEO complaint and the incidents described in the anonymous email.

## II. Standard of Review

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986); *Moore v. Phillip Morris Cos.*, 8 F.3d 335, 339 (6th Cir. 1993). All facts and all inferences to be drawn therefrom must be viewed in the light

most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002). "Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations." *Curtis Through Curtis v. Universal Match Corp.*, 778 F. Supp. 1421, 1423 (E.D. Tenn. 1991) (citing *Celotex*, 477 U.S. at 317). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Anderson*, 477 U.S. at 250. The Court does not weigh the evidence or determine the truth of the matter, *id.* at 249, nor does the Court search the record "to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

9

## III.    Analysis

### A.    Sex-Based Discrimination – Title VII and the THRA

Title VII makes it unlawful "for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1). The relevant part of the THRA states that it is discriminatory practice for an employer to "[f]ail or refuse to hire or discharge any person or otherwise discriminate against an individual with respect to compensation, terms, conditions or privileges of employment because of such individual's race, creed, color, religion, sex, age, or national group." Tenn. Code Ann. § 4-21-401(a)(1). The Tennessee legislature has made clear that the purpose of the THRA is to "[p]rovide for execution within Tennessee of the policies embodied in the federal Civil Rights Acts of 1964[.]" Tenn. Code Ann. § 4-21-101(a). *See Graves v. Circuit City Stores, Inc.*, No. 03A01-9501-CH-00012, 1995 WL 371659, at *2 (Tenn. Ct. App. June 21, 1995) ("Our Courts have looked to federal case law applying the provisions of the federal anti-discrimination statutes as the baseline for interpreting and applying the Tennessee Act."). "Both [the United States Court of Appeals for the Sixth Circuit] and the state courts in Tennessee have evaluated claims brought under the THRA in the same manner as Title VII claims" *Sybrandt v. Home Depot, U.S.A., Inc.*, 560 F.3d 553, 557 (6th Cir. 2009) (citing *Madden v. Chattanooga City Wide Serv. Dep't*, 549 F.3d 666, 673 (6th Cir. 2008) and *Graves*, 1995 WL 371659, at *2)). This Court therefore will apply the same analysis to plaintiff's sex-based discrimination claim under the THRA as plaintiff's sex-based

10

discrimination claim under Title VII. The Court's disposition of plaintiff's Title VII claim will apply with equal force to her THRA claim.

A Title VII claim may be established through direct or circumstantial evidence. *See, e.g.*, *Dicarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004). A plaintiff who cannot provide direct evidence of discrimination may still base her claim on circumstantial evidence. "'In discrimination cases, direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.'" *Higdon v. Sortz Instrument Co.*, 211 F.3d 1269 (Table), 2000 WL 420685, at *2 (6th Cir. Apr. 12, 2000) (quoting *Jacklyn v. Schering-Plough Healthcare Prod. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)).

Plaintiff has not presented any direct evidence of sex-based discrimination. She may, however, base her claim on circumstantial evidence.

Title VII and THRA claims based on circumstantial evidence are analyzed under the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 593 (6th Cir. 2007). Under the *McDonnell Douglas* framework, the burden is on the plaintiff to first establish a prima facie case. 411 U.S. at 802; *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981). To establish a prima facie case of sex-based discrimination, the plaintiff must demonstrate (1) she is a member of a protected class; (2) that she suffered an adverse employment action; (3) that she was qualified for the job; and (4) that her employer treated similarly situated employees outside the protected class more favorably, or that her position

11

was filled with a person outside of her protected class. *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006). Once a prima facie case has been shown, the plaintiff is entitled to a presumption that the defendant discriminated against her in violation of Title VII. *Id.* (citing *Dicarlo*, 358 F.3d at 414). The defendant then bears the burden of production to put forth a "legitimate, nondiscriminatory reason" for the complained of adverse treatment. *Id.* (citing *Burdine*, 450 U.S. at 254). "'The explanation provided must be legally sufficient to justify a judgment for the defendant.'" *Id.* (quoting *Burdine*, 450 U.S. at 255). If the defendant meets this burden, the presumption created by the prima facie case falls away, and the plaintiff needs to show that the defendant's proffered reason was a "pretext for discrimination." *Id.* (citing *DiCarlo*, 358 F.3d at 441-15(quoting *Burdine*, 450 U.S. at 253)). Throughout this burden-shifting approach, the plaintiff continues to bear the ultimate burden of proving, by a preponderance of the evidence, the intent to discriminate. *St. Mary's Honor Crt. v. Hicks*, 509 U.S. 502, 511 (1993).

Here, the first two elements of plaintiff's prima facie case of sex-based discrimination are undisputed. That is, that plaintiff is female, a member of a protected class, *see, e.g., Dobbs-Weinstein v. Vanderbilt Univ.*, 185 F.3d 542, 544 (6th Cir. 1999), *cert. denied*, 529 U.S. 1019 (2000) (stating that a female plaintiff alleging sex-based discrimination is a member of a protected class), and plaintiff was terminated from her employment, an adverse employment action. *See, e.g., Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885-86 (6th Cir. 1996) (discussing what constitutes an adverse employment action). NSC asserts, however, that plaintiff cannot establish the third and fourth elements of her prima facie case.

### 1. Qualified for the Position

NSC argues that plaintiff has not satisfied the third element of her prima facie case because she failed to meet NSC's legitimate expectations for her job performance and therefore was not qualified for her position. NSC asserts that plaintiff was unable to perform her job duties in a satisfactory manner both before and after her promotion, and that her unsatisfactory performance following her promotion culminated in NSC's termination decision. NSC points out that plaintiff was placed on the DAP within the first few months of being hired, that during her training and after her promotion, Morris, Stigall, and Quinn gave her counselings regarding her job performance, that these counselings included warnings about plaintiff's lack of initiative and assertiveness in learning her duties, her failure to file reports, her lack of interest in learning operations, and her engagement in non-work-related matters during work hours. NSC asserts that after her promotion, plaintiff continued to demonstrate a lack of proficiency in her knowledge of terminal operations, that she sometimes failed to complete reports and submit safety audits, and that she failed to follow instructions. NSC also points to plaintiff's improper handling of the side-swipe incident. Last, NSC asserts that plaintiff's unsatisfactory performance under the PIP and her failure to make a passing score on the rules examinations show that after her promotion, plaintiff was not meeting NSC's legitimate expectations and therefore NSC determined that she was not qualified for her position.

Plaintiff argues that because NSC promoted her, she is necessarily qualified for her position. She asserts that NSC was aware of her supposed infractions, her record on

performance examinations, and her performance record when it chose to promote her. She contends that because these issues did not disqualify her from her position prior to her promotion, there is a genuine issue of fact as to whether she was qualified for her position when she was terminated. Plaintiff also asserts that because she engaged in protected activity and was retaliated against following her promotion, that the close proximity between her complaints to NSC management and her termination raises an inference of causation. Last, plaintiff asserts that she was qualified for her position because rather than being terminated in December 2008, she was placed on the PIP.

The test in the Sixth Circuit for whether an employee was qualified for her position is whether the employee met the legitimate expectations of his or her employer. *McDonald v. Union Camp. Corp.*, 898 F.2d 1155, 1160 (6th Cir. 1990) (stating that in order to show qualification, an employer must show that he was "performing his job at a level which met his employer's legitimate expectations" at the time of his dismissal") (citations omitted). For purposes of the prima facie analysis, the qualifications of an employee are assessed in terms of whether he or she was meeting the expectations of the employer prior to and independent of the events that led to the adverse action. *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 585 (6th Cir. 2002).

As an initial matter, the Court notes that plaintiff has conflated her sex-based discrimination and her retaliation claims. While a temporal proximity between plaintiff's termination and her alleged exercise of protected activity is important to the Court's analysis of her retaliation claim, it is irrelevant to the Court's consideration of whether plaintiff was

14

qualified for her position. The Court also does not find plaintiff's argument regarding placing her on the PIP in December 2008, instead of terminating her, to support her argument that she was qualified for her position. Rather, the PIP's identification of targeted areas in plaintiff's performance which needed improvement, and the steps the PIP laid out for plaintiff to follow, demonstrate that plaintiff was not meeting NSC's performance expectations within the month prior to her termination.

As to plaintiff's argument that she was qualified for her position, as represented by her promotion, the Court disagrees that her promotion alone shows that she was qualified for her position at the time of her termination. As noted by the Sixth Circuit in *Murphy v. Univ. of Cincinnati*, an employee may meet an employer's initial qualifications at hiring, but this does not mean that the employee will never then be found by the employer to be unqualified. 72 F. App'x 288, 293 (6th Cir. 2003). In *Murphy*, the plaintiff advanced an argument similar to the argument plaintiff advances here—that because she was hired, she was necessarily qualified for the position from which she was later terminated. *Id.* at 292. The Sixth Circuit disagreed, noting that the plaintiff had produced no evidence that the employer was ever happy with the plaintiff's performance once she commenced employment and that "[the plaintiff] would have us hold that once [she] . . . is objectively qualified through proper training, licensure, or output requirements, she can never be found unqualified, regardless of her actual performance." *Id.* at 293.

Here, it is undisputed that plaintiff's supervisors and NSC management noted problems with plaintiff's job performance before her promotion, as evidenced by the DAP,

15

McKeehan's email to Stighall, Morris' evaluation of plaintiff's performance, and Stighall's status report phone call with plaintiff. More importantly, it is undisputed that plaintiff's supervisors and NSC management noted problems with plaintiff's performance after her promotion. Plaintiff does not dispute that Morris informed her that he was not satisfied with her performance following the side-swipe incident and that after her promotion he sent her several emails which document her failure to submit required reports. Finally, plaintiff does not dispute that she was placed on the PIP on December 22, 2008, does not dispute that Guinn documented his opinion that plaintiff's performance after being placed on the PIP was unsatisfactory, and does not dispute that plaintiff failed to make passing scores on the rules examinations.

While plaintiff relies primarily on the fact that she was promoted in October 2008 to demonstrate her qualifications, this reliance fails to consider NSC's overall evaluation of her performance, namely, the PIP and NSC's documented impressions of her performance following the PIP. Similar to the plaintiff in *Murphy*, plaintiff has presented no evidence that her job performance met NSC's legitimate expectations at the time of her termination. Accordingly, given the DAP, the written and verbal counselings by plaintiff's supervisors and NSC management, plaintiff's performance following the side-swipe incident, plaintiff's failure to make passing scores on the rules examinations, and plaintiff's failure to meet the requirements of the PIP, the Court finds that plaintiff has not demonstrated the third element of her prima facie case. However, even if plaintiff was qualified for the position, her claim

of sex-based discrimination still fails because, as explained below, she has failed to satisfy the fourth element of that prima facie case.

### 2. Similarly Situated

A plaintiff may establish the fourth prong of a prima facie case of sex-based discrimination under Title VII and the THRA by identifying at least one comparable employee outside the protected classification who was similarly situated in all relevant respects, but who nonetheless received more favorable treatment. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). A plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered "similarly situated." *Id.* Rather, a plaintiff need only show that they are similar in all relevant aspects. *Id.*; *Clayton v. Meijer, Inc.*, 281 F.3d 605, 610-11 (6th Cir. 2002). One panel of the Sixth Circuit has stated that in order to deem employees "similarly situated," a court should "make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee" as opposed to assuming that only specific factors must be present for an employee to be found similarly situated. *Gibson v. Shelly Co.*, 314 F. App'x. 760, 771 (6th Cir. 2008) (noting that comparable employees do not necessarily have to have dealt with the same supervisor or be subject to the exact same standards).

In her response brief, plaintiff asserts that she "can show that persons outside of the protected class was [sic] treated more favorably than Plaintiff. . . . Plaintiff incorporates her facts from Section II, by reference as though set forth in its entirety as a showing of

17

differential treatment of males." [Doc. 51, p. 21]. Plaintiff does not identify which "males" from her statement of facts are similarly situated to her for purposes of this analysis, let alone describe what their positions were, the standards NSC held them to, or how their conduct was similar to plaintiff's conduct.[2] In other words, plaintiff has undertaken no analysis of whether a male employee was similarly situated to her, but treated differently by NSC. While plaintiff has alleged, throughout her statement of facts, that males were allowed to do things she was not, that in the opinions of several of her co-workers, males were treated better, and that Stigall and Morris treated her harshly than they treated males, plaintiff has failed to describe which males enjoyed more favorable treatment, whether these males occupied the same position as plaintiff, or whether they received similar counseling and performance reviews. These conclusory allegations, in lieu of a similarly situated analysis, do not demonstrate that employees not within plaintiff's protected class were treated differently.

### 3. Replaced by an Individual Outside of the Protected Class

Alternatively, plaintiff argues that she can meet the fourth element of her prima facie case by demonstrating that she was replaced by a male. Plaintiff relies solely on the following portion of Stigall's deposition testimony in support of this argument:

---

[2]Plaintiff names a number of male employees in her statement of facts, including William Hitch, Kevin Triplett, Ronnie Campbell, Ernest Hamilton, "Lavender" and "Island" (whom the Court assumes to be male), Brandon Smith, J. Blake Chambers, and Bill Herald. Plaintiff, however, provides no analysis showing how any of these males are similarly situated to her for purposes of the fourth element of her prima facie case.

18

> Attorney: . . . . What female trainmasters have you had since July of 2007 when [plaintiff] started?
>
> Stigall: The ones I had were prior to [plaintiff].

[Doc. 51-1, pp. 32].

While a plaintiff may indeed satisfy the fourth element of a prima facie case by showing that she was replaced by someone outside her protected class, the record of this case does not demonstrate that plaintiff in this case has done so. Without more, the above-cited portion of Stigall's testimony does not demonstrate that plaintiff was replaced by a male. Stigall did not testify that plaintiff was replaced by a male or a female, and the record does not indicate that NSC hired a new trainmaster to take plaintiff's place.

## B. Retaliatory Discharge

Retaliation claims under Title VII and the THRA are governed by the same burden-shifting framework as sex-based discrimination claims under Title VII and the THRA. *Kessler v. Riccardi*, 363 F. App'x 350, 355 (6th Cir. 2010). Thus, because plaintiff has set forth no direct evidence of retaliation, such as an explicit statement that she was terminated due to engagement in a protected activity, the *McDonnell Douglas* burden-shifting framework for proving her retaliation claims on the basis of circumstantial evidence applies. Accordingly, plaintiff must make out her prima facie case of retaliatory discharge by showing: (1) that she engaged in protected conduct; (2) that NSC had knowledge of her protected activity; (3) that NSC took an adverse employment action against her; and (4) that

there was a causal connection between the protected activity and the adverse employment action.  *Id.*; *see also Fox v. Eagle Distrib. Co.*, 510 F.3d 587, 591 (6th Cir. 2007).

As noted above, Tennessee state courts have "looked to federal case law applying the provisions of the federal anti-discrimination statutes as the baseline for interpreting and applying [the THRA]."  *Graves v. Circuit City Stores, Inc.*, No. 03A01-9501-CG-00012, 1995 WL 371659, at *2 (Tenn. Ct. App. June 21, 1995) (citation omitted).  While the Tennessee Supreme Court's decision in *Gossett v. Tractor Supply Co., Inc.*, 320 S.W.3d 777 (Tenn. 2010), called into question the continuing utilization of the *McDonnell Douglas* framework for retaliation claims under state law, the standard to be applied at the summary judgment stage is procedural and thus, the Court will apply the *McDonnell Douglas* framework to plaintiff's THRA retaliation claims.  *Moling v. O'Reilly Auto., Inc.*, No. 09-1100, 763 F. Supp. 2d 956, 977-78, 2011 WL 112586, at *20-*21 (W.D. Tenn. Jan. 13, 2011); *Atkins v. Denso Mfg. Tenn., Inc.*, No. 3:09-CV-520, 2011 WL 5023392, at *16 (E. D. Tenn. Oct. 20, 2011).  In addition, on June 10, 2011, an amendment to Tenn. Code Ann. § 4-21-311(e) took effect which appears to abrogate *Gossett* and require the continued application of the *McDonnell Douglas* framework to THRA cases in accordance with the law prior to *Gossett*.  *See* Tenn. Code Ann. § 4-21-311(e); 2011 Tenn. Pub. Acts, c., 461, § 1, eff. June 10, 2011.

Protected activity for the purposes of Title VII may include either participation in any proceeding under Title VII (the "participation clause"), or opposition to a practice declared discriminatory under Title VII (the "opposition clause").  *See Johnson v. Univ. of Cincinnati*,

215 F.3d 561, 581 (6th Cir. 2000) (interpreting Title VII's anti-retaliation provision). Plaintiff's retaliation claim falls within the "opposition" clause of Title VII.

Under the opposition clause, an employee is protected against employer retaliation for opposing any practice that the employee reasonably believes to be a violation of Title VII. *Johnson*, 215 F.3d at 579-80. Generally, "opposition" encompasses "complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices; refusing to obey an order because the worker thinks it is unlawful under Title VII; and opposing unlawful acts by persons other than the employer—*e.g.*, former employers, union, and co-workers." *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 721 (6th Cir. 2008). at 721 (quoting *Johnson*, 215 F.3d at 579). The plaintiff's opposition must arise from "a reasonable and good faith belief that the opposed practices were unlawful." *Johnson*, 215 F.3d at 579. The plaintiff need not show that the practices were actually unlawful, *id.*, but must show that she raised her opposition in a reasonable manner. *See Niswander*, 529 F.3d at 721. Recently, the Supreme Court established that "[w]hen an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always constitutes the employee's opposition to the activity." *Crawford v. Metro. Gov't of Nashville & Davidson Cty.*, 555 U.S. 271, 276 (2009). Opposition does not require the plaintiff to engage in "active, consistent 'opposing' activities," but rather, mere disclosure will suffice. *Id.* at 277. Under the Sixth Circuit's jurisprudence, however, "a vague charge of discrimination in an internal letter or memorandum is insufficient to constitute opposition to an unlawful employment practice."

21

*Fox v. Eagle Distrib. Co.*, 510 F.3d 587, 591 (6th Cir. 2007) (quoting *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir.1989)).

NSC argues that plaintiff has not established a prima facie case of retaliation because she cannot show that she engaged in a protected activity [Doc. 51, pp. 25-26]. In response, plaintiff argues that the following incidents constitute an exercise of protected activity: (1) her January 30, 2008 report to Morris about Stigall's harsh and condescending manner towards her [Doc. 43-2, p. 22]; (2) her June 30, 2008 EEO complaint [Doc. 51-1, pp. 104-06]; (3) her July 15, 2008 email to Browne [*Id.*, p. 88]; (4) her October 1, 2008 complaint about Chambers [*Id.*, p. 111]; and (5) her October 31, 2008 and November 11, 2008 confirmation to NSC of the truth of the contents of the anonymous email [*Id.*, pp. 89-90]. Thus, plaintiff argues that she engaged in protected activity both prior and after NSC's investigation into the allegations of the anonymous email [Doc. 69].

The Court agrees with NSC that plaintiff's January 30, 2008 report to Morris about Stigall's harsh and condescending conduct, plaintiff's June 30, 2008 EEO complaint, and plaintiff's October 1, 2008 complaint about Chambers do not constitute protected activity based on a matter made unlawful by Title VII or the THRA. Plaintiff's complaints in these instances are about the "stern," "harsh," or "condescending" manner in which Stighall spoke to her, the untimeliness of Stighall's feedback on her performance, plaintiff's unhappiness about being assigned to Knoxville rather than Norfolk, and a complaint that Chambers was disrespectful, argumentative, and uncooperative [Doc. 51-1, pp. 80-81, 117-18; Doc. 43-2,

pp. 20-21; Doc. 43-6, ¶ 3; Doc. 51-1, p. 111].[3]  While plaintiff may have complained and reported that her supervisors were acting unfairly or harshly, this type of complaint does not constitute protected activity about matters made unlawful by Title VII or the THRA.  *See Philip v. Wrigley Mfg. Co., LLC*, No. 1;09-CV-144, 2010 U.S. Dist. LEXIS 112747, at *33 (E.D. Tenn. Oct. 22, 2010) (noting that "[c]omplaints about the way a business is being run, or even 'complaints concerning unfair treatment in general' are insufficient to constitute protected activity if they do not "specifically address discrimination") (quoting *Weaver v. Ohio State Univ.*, 71 F. Supp. 2d 789, 793-94 (S.D. Ohio. 1998)).  *See also Lockett v. Marsh USA, Inc.*, 354 F. App'x 984, 997 (6th Cir.2009) (finding that a report filed by an employee did not constitute protected activity when it "did not take an overt stand against suspected illegal discriminatory action; it did not even mention the term discrimination; it did not suggest the need for an investigation into discriminatory practices, and there is no evidence that [recipients of the report] understood [it] to be charging discrimination").

As to plaintiff's July 15, 2008 email to Browne, the first part of that email pertains to plaintiff's problems with housing [Doc. 51-1, p. 88].  The second part of the email states, in pertinent part:

> I am deeply concerned that I am not receiving an equal opportunity as the other trainees . . . that I [am] getting marked up on so that I may [may] have the same preparation opportunities for the October 1, 2008 promotion date.

---

[3]Plaintiff also seems to acknowledge in her response brief that she did not "articulate that she felt she was being discriminated against on the basis of her sex during" her June 30, 2008 complaint [Doc. 51, pp. 25-26].

[*Id.*].  Similar to the complaints discussed above, this email does not contain an allegation that NSC's denial of equal opportunity was based on plaintiff's sex or any other matter made unlawful by Title VII or the THRA.

The only incidents to raise a question about whether plaintiff complained to NSC regarding a matter made unlawful by Title VII or the THRA are plaintiff's October 31, 2008 confirmation of the truth of the contents of the October 9, 2008 anonymous email, and plaintiff's subsequent meeting with NSC to go over the contents of that email.  In addition to mentioning the matters referenced in her June 30, 2008 EEO complaint and unfair treatment by plaintiff's supervisors, the anonymous email references the March 2008 alleged sexual assault by Smith (without mentioning Smith's name or the date on which the incident occurred) and states that this incident made plaintiff not trust Smith in a "sexual way." [Doc. 51-1].  The email also states that plaintiff was told the only reason she was in Knoxville was so others could force her to quit for filing the EEO complaint, and because she had been told that two trainmasters "hang out with [a] yardmaster and . . . talk unfavorably about her in a sexual way and . . . it shows in the way they treat her at work." [*Id.*, p. 89].  Finally, the email states that plaintiff was "crying and vomiting with anxiety about having to stay in Knoxville . . . . I don't [sic] want to make this worse for her or cost her, her job (that is what she is afraid of now and that why she wont [sic] talk to anyone)." [*Id.*].

First, the Court notes that it is unclear from the record who composed the anonymous email or whether plaintiff herself wrote the email.  Plaintiff states in her declaration that she only went over the issues raised in the email with an NSC employee and confirmed the truth

24

of its contents [Doc. 51-1, ¶¶ 46, 47]. Allegations in an anonymous email would have given NSC no way of knowing that a particular employee was exercising protected rights by complaining about unlawful activity. Second, while the anonymous email asserts retaliatory conduct for plaintiff's filing of the June 30, 2008 EEO complaint, that complaint contained only plaintiff's complaints about her placement in Knoxville and about Stigall's harsh and condescending manner, not conduct that is protected under Title VII or the THRA. Third, plaintiff testified at her deposition that she never reported the March 2008 incident mentioned in the anonymous email, other than in her October 31, 2008 confirmation of the truth of contents of that email and her subsequent discussion with NSC [Doc. 43-2, p. 17]. *Speck v. City of Memphis*, 370 F. App'x 622, 626 (6th Cir. 2010) (stating that to make out a claim for retaliation under the ADEA, the plaintiff "must have referenced alleged acts of age *discrimination* . . . [the plaintiff] produced no evidence that she ever mentioned age discrimination in any of her complaints before resigning. She complained about being targeted for unfair treatment, but not about being targeted because of her age"). Fourth, the anonymous email does not identify Smith or any of the trainmasters who allegedly talked about plaintiff in a sexual way. Finally, the allegations in the anonymous email are not that NSC itself was engaging in unlawful discrimination on the basis of sex, but that several of its employees were behaving in a sexually inappropriate manner. *See, e.g., Booker*, 879 F.2d at 1313 (noting that a plaintiff's allegation in a letter than an employee may be a racist due

to statements the employee made was not an "allegation . . . that [the employer] is engaging in unlawful employment practice, but that one of its employees has a racial intolerance.").[4]

While the record of this case shows that plaintiff made a number of complaints to NSC management regarding what she perceived as unfair, harsh, and condescending treatment by her supervisors and co-workers, the majority of these complaints do not relate to sex. In regard to the single incident that does involve sex, plaintiff admitted that she did not report the March 2008 alleged sexual assault incident, only notifying NSC of the incident more than eight months after it occurred by confirming the truth of the anonymous email. Furthermore, the anonymous email only contains vague references to sexually inappropriate behavior by NSC employees and does not identify either the perpetrators of this behavior or the dates on which it occurred. *Balding-Margolks v. Cleveland Arcade*, 352 F. App'x 35, 45 (6th Cir. 2009) (stating that the plaintiff did not state a Title VII retaliation action because "a vague charge of discrimination in an internal letter . . . is insufficient to constitute

_____

[4]Because plaintiff did not file her EEOC charge until September 2009, her participation in NSC's November 2008 internal investigation into the March 2008 incident involving Smith cannot constitute protected activity under the participation clause. *See Abbott v. Crown Motor, Inc.*, 348 F.3d 537, 543 (6th Cir. 2003) (noting that participation in an employer's internal investigation prior to the filing of an EEOC charge does not fall within the protection of the "participation clause" under Title VII). While an employee's communications to her employer during an internal investigation may constitute protected activity under the "opposition" clause, *see Crawford*, 555 U.S. 271, the Court does not read plaintiff's retaliation claim as being that she was retaliated against by NSC for responding to questions during NSC's internal investigation into the contents of the anonymous email. Rather, plaintiff alleges that the investigation NSC took into the contents of the anonymous email was inadequate. However, even if plaintiff's communications to NSC during its internal investigation do constitute a protected activity under the opposition clause, as explained *infra*, the Court has determined that plaintiff has not met her burden of proving pretext.

26

opposition to an unlawful employment practice" and the plaintiff never spoke with management about sexual or age-based discrimination).

In sum, the Court concludes that plaintiff cannot show that she engaged in protected activity. As such, plaintiff has failed to demonstrate a prima facie case for retaliation under Title VII and the THRA.

### C. Legitimate, Non-Discriminatory Reason and Pretext[5]

Having found that plaintiff has failed to satisfy her prima facie cases of sex-based discrimination and retaliation in violation of Title VII and the THRA, the Court need not address whether plaintiff has established pretext. Nevertheless, the Court notes that NSC has set forth a legitimate, non-discriminatory reason for plaintiff's termination, that is, that plaintiff's job performance did not meet NSC's legitimate expectations.

As previously explained, once a defendant makes the appropriate showing, the plaintiff carries the burden of persuasion and must demonstrate that the defendant's proffered reason was a pretext for discrimination. *Burdine*, 450 U.S. at 252-555. To establish pretext, a plaintiff may show one of the following: (1) the reason has no basis in fact; (2) the reason did not actually motivate the challenged conduct; or (3) the reason was insufficient to warrant the challenged conduct. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003) (en banc) (internal quotations and citation omitted). The first and third showings of pretext consist of evidence attacking the credibility of the employer's proffered motivation

---

[5]Plaintiff makes a single pretext argument for her sex-based discrimination and her retaliation claims under Title VII, the THRA, the TPPA, and Tennessee common law.

for the termination, such as evidence that the proffered reason for the plaintiff's discharge never happened, that the reasons were factually false, or that other employees outside the protected class were not terminated even though they engaged in substantially identical conduct as that which the employer contends motivated the plaintiff's discharge. *See Jones v. Potter*, 488 F.3d 397, 406 (6th Cir. 2007) (describing a showing of pretext under the *McDonnell Douglas* framework for a claim under the ADA). In making the second showing, a plaintiff "admits the factual basis underlying the employer's proffered explanation and further admits that such conduct *could* motivate dismissal." *Mischer v. Erie Metro Hous. Auth.*, 168 F. App'x 709, 715 (6th Cir. 2006) (discussing a showing of pretext under the *McDonnell Douglas* framework for a claim under Title VII) (emphasis in original). In other words, instead of disputing the facts, the "plaintiff attempts to indict the credibility of his employer's explanation" and show "that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup[]" for the illegal discrimination. *Id.* Finally, the Court notes that "unless it is shown *both* that the reason was false, *and* that discrimination [or retaliation] was the real reason[,]" a plaintiff has not proved pretext. *Harris v. Metro. Gov't of Nashville*, 594 F.3d 476, 486 (6th Cir. 2010) (quoting *Hicks*, 509 U.S. at 515).

Plaintiff's three arguments for why NSC's reason for her termination is pretextual fall under the second method of showing pretext. First, plaintiff asserts that she has shown pretext because no disciplinary action was placed in her file between the November 2007 DAP and the December 22, 2008 PIP. Second, plaintiff asserts that NSC's reason is

28

pretextual because Hitch and Triplett, plaintiff's co-workers, stated that, in their opinions, plaintiff's performance was typical of new trainmasters and her performance could not reasonably be a basis for her termination [Doc. 51-1, pp. 92-96]. Third, plaintiff asserts that she has presented sufficient circumstantial evidence showing that she was subject to excessive scrutiny by NSC and that her conduct was scrutinized more carefully than that of her male co-workers, as evidenced by plaintiff's affidavit and Triplett's affidavit which state that plaintiff was "picked on" by management, that the only difference between plaintiff and the other trainees was that plaintiff was female and the others were male, and that Smith made negative comments about plaintiff such as "She doesn't need to be here" and "I refuse to train her." [*Id.*, pp. 92-94].

Plaintiff's arguments regarding pretext are essentially that she and two of her co-workers believe that she was performing her job satisfactorily and did not deserve NSC's performance warnings or her ultimate termination, that males were treated better than her, and based on Hitch's observation of plaintiff and his experience with NSC and trainmasters, it is his opinion that it is questionable whether plaintiff's performance was the actual reason for her termination. Plaintiff has not, however, challenged the facts underlying NSC's problems with plaintiff's job performance.

There is no requirement that an employer place a disciplinary action in an employee's file at certain intervals before terminating that employee for performance reasons. However, assuming NSC did not place a formal disciplinary action in plaintiff's file, there is evidence that plaintiff received verbal and written counselings between November 2007 and December

29

2008 regarding her job performance, including emails and a oral notification by Morris that he was unsatisfied with plaintiff's performance after the side-swipe incident. In addition, there is no evidence in the record that NSC placed disciplinary actions in the files of other employees at any specific intervals or in response to counselings.

Plaintiff's submission of Hitch and Triplett's affidavits containing their opinions regarding plaintiff's job performance and treatment by her supervisors also do not show pretext. Plaintiff has not shown that either Hitch or Triplett have personal knowledge or experience relating to the training or counseling of trainmasters, or knowledge that makes them able to compare plaintiff's training and her performance to that of other trainmasters. Plaintiff has also not demonstrated that Hitch or Triplett had any involvement in NSC's decision-making processes in regard to its employees and their jobs. There is no evidence that Hitch or Triplett had access to information regarding NSC's problems with plaintiff's performance or the performance evaluations of trainmasters similarly situated to plaintiff. Further, as noted by the Sixth Circuit "[w]ithout more, mere opinions expressed by co-workers who have no direct involvement in the decision-making processes have no probative value as to [an employer's] alleged discriminatory intent." *Haley v. Gen. Elec. Co.*, 3 F. App'x 240, 248 (6th Cir. 2001). *See also McGee v. Geneseco, Inc.*, No. 92-6230, 1994 WL 4721, at *5 (Table) (6th Cir. Jan. 6, 1994) (stating that while three co-workers filed affidavits expressing their opinions that the plaintiff had performed her duties capably, it was "uncontested that these individuals were not in a position to evaluate [the plaintiff's] performance knowledgeably, especially with respect to the problems identified by [the]

30

defendants[,]" and that the affidavits of these individuals were insufficient to create a genuine issue of fact on the issue of pretext).  Hitch's affidavit makes only one mention of "males," stating that "[i]n contrast to [plaintiff], I am concerned about the proficiency of other trainmasters with whom I work, all of whom are males." [Doc. 51-1, p. 96].  In addition, while Triplett asserts in his affidavit that plaintiff was "picked on" by management and given the "cold shoulder" by male employees, he offers no specific examples of this treatment, does not identify which members of NSC management or which male employees he is referring to, and does not state when or where these incidents occurred.  The one specific incident referred to by Triplett in his affidavit are comments by Smith which Triplett asserts indicate that Smith expressed negative opinions about women.  Notably, Triplett does not state whether Smith's comments were made to plaintiff.

In regard to plaintiff's argument that her performance and conduct was scrutinized more carefully than that of her male co-workers, the Court has not found evidence in the record to support this.  As noted by the Sixth Circuit in *Harrison v. Metro. Gov't of Nashville & Davidson Cnty.*, 80 F.3d 1107, 1119 (6th Cir. 1996), *overruled on other grounds by Jackson v. Quanex Corp.*, 191 F.3d 647, 667 (6th Cir. 1999), when the record reveals that a "plaintiff's activities were scrutinized more carefully than those of comparably situated employees[,]" this may support a finding that a defendant's reasons were pretextual. However, in this case, as noted in the Court's discussion of the similarly situated element of plaintiff's prima facie case of sex-based discrimination, plaintiff has not undertaken any

31

analysis of her male co-workers and their positions or their conduct in regard to their job performance was comparable to hers, yet they received different treatment.

Finally, the Sixth Circuit has adopted an "honest belief" rule with regard to an employer's proffered reason for discharging an employee. *See Weimer v. Honda of Am. Mfg., Inc.*, 356 F. App'x 812, 817-18 (6th Cir. 2009) ("Where the employer can demonstrate an honest belief in its proffered reason, the inference of pretext is not warranted."). Under the "honest belief" rule, "so long as an employer honestly believed in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be mistake or incorrect." *Kurincic v. Stein Inc.*, 30 F. App'x 420, 425, 2005 WL 231417, at *3 (6th Cir. 2002) (citing *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1988)). An employer has an "honest belief" in its reasons for discharging its employee when the employer "reasonably relied on the particularized facts then before it" and "made a reasonably informed and considered decision before taking an adverse employment action." *Smith*, 155 F.3d at 807.

Here, NSC has offered evidence to substantiate its reasons for plaintiff's termination. The undisputed facts in the record show that plaintiff was placed on the DAP within several months of hiring, and that she was counseled in January, September, October, and November of 2008 about aspects of her job performance. Plaintiff was then placed on the PIP on December 22, 2008 and, on January 7, 2009, plaintiff's training coordinator documented his opinion that plaintiff lacked proficiency with terminal operations and was unable to make a passing score on the rules examinations [Doc. 43-8]. Given the foregoing, the Court finds

32

that plaintiff has not demonstrated that Manion, the decision-maker in regard to her termination, did not have an honest belief that plaintiff's job performance was deficient at the time of her termination. Although plaintiff disputes aspects of the contents and context of the DAP, the PIP, the written and verbal counselings by her supervisors and training coordinators, her disagreement with NSC's assessment of her performance does not render NSC's reasons for her termination pretextual. *See, e.g., Lefevers v. GAF Fiberglass Corp.*, 667 F.3d 721, 726 (6th Cir. 2012) (finding, in a reduction in force case, that the plaintiff had not produced sufficient evidence to show pretext when the plaintiff's poor performance evaluations reflected the defendant's legitimate assessment that the plaintiff's job performance had declined to an inadequate level) (citing *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1162 (6th Cir. 1990)).

### D. Retaliatory Discharge Under Tennessee Common Law and the TPPA

The Court now turns to plaintiff's claims that she was terminated in retaliation for refusing to participate in and/or remain silent about illegal activities, in violation of the Tennessee common law and the TPPA. Tennessee common law protects employees from being discharged for refusing to violate a clear public policy evidence by an unambiguous constitutional, statutory, or regulatory provision. *Mason v. Seaton*, 942 S.W.2d 470, 475 (Tenn. 1997). The TPPA extends the common law to protect employees not only from discharge for failing to participate in violations of clear public policy, but also from discharge for refusing to remain silent about such violations in their workplace. *Id.*

33

For plaintiff to establish a prima facie case under the TPPA she must prove: (1) her status as an employee of NSC; (2) her refusal to participate in, or to remain silent about illegal activities; (3) that she was discharged; (4) and an exclusive casual relationship between a refusal to participate or to remain silent about illegal activities and her termination. *See Merryman v. Central Parking Sys., Inc.*, No. 01A01-9203-CH-0076, 1992 WL 330404, at *6 (Tenn. Ct. App. 1992). The elements of a common law retaliatory discharge claim are: (1) that an at-will employment relationship existed between plaintiff and NSC; (2) that plaintiff was discharged; (3) that the reason for the discharge was that plaintiff attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional statutory or regulatory provision; and (4) that a substantial factor in NSC's decision to discharge plaintiff was her exercise of protected rights or compliance with clear public policy. *Crews v. Buckman Labs., Int'l, Inc.*, 78 S.W.3d 852, 862 (Tenn. 2002). Tennessee courts have held that a plaintiff must meet the requirements under the TPPA in order to establish a common law claim of retaliatory discharge. *Guy v. Mut. of Omaha Ins., Co.*, No. W1999-00942-COA-R9-CV, 2001 WL 204485, at *9 (Tenn. Ct. App. Mar. 1, 2001). Thus, the Court will analyze these claims pursuant to the statutory framework.

Similar to retaliation claims under Title VII and the THRA, if an employee establishes a prima facie case of retaliatory discharge, the burden shifts to the employer to assert a "legitimate, non-pretextual reason for the employee's discharge." *Caruso v. St. Jude's Children's Research Hosp., Inc.*, 215 F. Supp. 2d 940, 937 (W.D. Tenn. July 9, 2002)

34

(citation omitted). If the employer satisfies this burden, the burden shifts back to the employee to prove that the employer's explanation is pretextual. *Id.* In proving pretext, the employee "must present specific admissible facts, which realistically challenge the defendant's stated reasons." *Id.* at 937-38 (citation omitted).

The Court finds, for the same reasons given in the Court's analysis of plaintiff's claim for retaliation under Title VII and the THRA that plaintiff has not established that she refused to participate or remain silent about an illegal activity or an activity that violates a clear public policy evidenced by an unambiguous constitutional statutory or regulatory provision. The record is clear that the majority of plaintiff's complaints to NSC did not involve sex but were in regard to what plaintiff perceived as harsh, condescending, or unfair treatment. Plaintiff has provided no law under which her complaints about these matters are protected by the TPPA and the common law. In addition, the Court does not find that plaintiff's confirmation of the incidents referenced in the anonymous email and her discussion with NSC about those incidents constitute the type of conduct protected by the TPPA and the common law. It is unclear whether plaintiff herself ever actually reported the incidents referenced in the anonymous email and the contents of that email do not constitute a report or complaint that NSC was engaging in discrimination on the basis of sex. Thus, the Court concludes that plaintiff has failed to establish a prima facie case for retaliation under the TPPA or the common law.

Finally, and even if plaintiff had stated a prima facie case of retaliation under the TPPA and Tennessee common law, for the same reasons given above in regard to plaintiff's

Title VII and THRA claims, the Court finds that plaintiff has failed to establish that NSC's legitimate, non-discriminatory reason for plaintiff's termination was pretext.

## IV.    Conclusion

For the reasons explained herein, NSC's Motion for Summary Judgment [Doc. 43] will be **GRANTED** and all claims brought by plaintiff will be **DISMISSED**.  The Clerk of Court will be **DIRECTED** to close this case.  An appropriate order will be entered.

IT IS SO ORDERED.


s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE